UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

AMANDA S. HUFF,           )
                          )
        Plaintiff,        )
                          )    No. 2:11CV61 RWS/FRB
                          )
    v.                    )
                          )
                          )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,       )
                          )
        Defendant.        )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b), for appropriate disposition.

### I.   Procedural Background

On August 19, 2008, plaintiff Amanda S. Huff ("plaintiff") applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability as of February 1, 2006. (Administrative Transcript ("Tr.") at 100-11). Plaintiff's applications were initially denied, and she requested a hearing before an administrative law judge ("ALJ"), which was held on May 5, 2010. (Tr. 19-32; 48-49). On July 7, 2010, the ALJ issued a decision denying plaintiff's applications. (Tr. 5-18).

Plaintiff subsequently sought review of the ALJ's hearing decision from defendant agency's Appeals Council. (Tr. 4). On June 14, 2011, the Appeals Council denied plaintiff's request for review. (Tr. 1-3). The ALJ's decision thus stands as the Commissioner's final decision. 42 U.S.C. § 405(g).

## II.   Evidence Before the ALJ

A.   <u>Plaintiff's Testimony</u>

Plaintiff was born in March of 1991, and she completed the eighth grade. (Tr. 21). She was a recipient of Medicaid benefits. (Tr. 22). She testified that she worked for three days beyond her alleged onset date of February 1, 2006. (Tr. 21-22).

The ALJ asked plaintiff why she was unable to work, and plaintiff replied, "I can't be around people. I have severe anxiety. I have, sorry, I'm nervous." (Tr. 22). She testified that she received psychological care, but did not feel that her doctor was helping her because all he did was change her medication. (<u>Id.</u>)

Plaintiff's counsel asked plaintiff to describe how her anxiety affected her. (Tr. 24). Plaintiff testified that she would not go to the grocery store because she felt that people were staring at her, which caused anxiety, chest pain, pounding in her head, trouble breathing, and vomiting. (Tr. 24, 26). Plaintiff testified that she experienced these symptoms on almost a daily basis. (Tr. 26). Plaintiff testified that she did not take her

-2-

kids to the park. (Tr. 25). She testified that she was bipolar and had "highs and lows," and stated that if she became "high to where I'm really really angry or something, it'll throw me into an anxiety attack." (Id.) Plaintiff testified that, on a daily basis, she had highs "all the time" and would "go from happy, to sad, to just instantly mad." (Tr. 24-25). Plaintiff testified that, when she was angry, she was "in your face. I want you to understand the way I'm feeling. I blow up, pretty much. I just, I'm actually really just blunt. Hateful." (Tr. 25). Plaintiff testified that she became this way over "[v]ery little things" such as hitting her foot or kicking a toy or if someone said something to her. (Id.) Plaintiff testified that she could not help it and could not bring herself out of it. (Id.) Plaintiff testified that she experienced crying spells on a daily basis. (Tr. 26). When asked to describe what caused the crying spells, plaintiff testified: "I have some messed up discs in my back that hurt me. I'll just sit and cry. If my daughter doesn't get her way, I'll sit and cry. If they don't listen to me, I'll sit and cry." (Id.) Plaintiff testified that she had trouble falling asleep and waking up. (Tr. 26-27).

Plaintiff testified that she had a ruptured disc and two bulging discs in her back, and could not walk her kids or push them in a stroller, or bend or stand for long periods of time. (Tr. 27-28). She testified that her back pain became very bad three or four times per week, and that when this happened she used a heating

pad and laid down. (Tr. 28). She testified that there were times her back pain would "put [her] down for three days, three or four days," and that she would stay in bed and not do a lot. (Id.)

Plaintiff testified that she had carpal tunnel syndrome, and could not lift a jug of tea or a gallon of milk without experiencing shooting pains into her elbow and shoulder, and could not write without experiencing cramping. (Id.) She testified that pain woke her in the middle of the night sometimes, and that she had to hold her hands above her head and rub them. (Id.)

Plaintiff testified that she had trouble with concentration when trying to read, watch television, or do laundry or dishes, explaining that she could not stay focused. (Tr. 29). She testified that, "a couple of times a week, at least," she did not get out of bed due to feeling "down and depressed" and felt she could not "deal with life." (Id.)

The ALJ also heard testimony from a vocational expert (also "VE"). Addressing the VE, the ALJ asked, "Ms. Hurley, would you share with us?" (Tr. 23). The VE then offered the following testimony regarding the classifications of plaintiff's past relevant work: buffet waitress, light and semi-skilled with a Specific Vocational Preparation ("SVP")[1] of three; fast food

_____

[1]"SVP" refers to the amount of time it generally takes to learn a job. See United States Dep't of Labor, Employment and Training Admin., Dictionary of Occupational Titles ("DOT"), Vol. II, Appendix C at 1009.

-4-

worker, light and unskilled with an SVP of two; convenience store cashier, light and unskilled with an SVP of two; nurse aide, medium and semi-skilled with an SVP of four; and janitor, heavy and unskilled with an SVP of two. (Id.) The ALJ asked no further questions of the VE. See (Tr. 23).

Plaintiff's attorney asked the VE to consider an individual of claimant's age, education and past relevant work experience, who experienced crying spells daily, had two days per week that depression made her unable to dress or care for her personal needs, had trouble concentrating, had daily anxiety that caused chest pain and nausea, and had "severe problems being around, leaving the house, or being around other people" and who became angry in any situation where there is confrontation. (Tr. 30-31). The VE testified that such an individual would be unable to perform plaintiff's past relevant work or any other work that existed in the national economy. (Tr. 30).

B.   Medical Evidence

Medical records from the Wilbers Family Care Clinic, the office of Londa Y. Swoboda, APRN, and Raymond Wilbers, M.D., indicate that plaintiff was seen on February 3, 2006 with complaints of right upper quadrant pain and mid epigastric pain. (Tr. 256). She reported that she was working as a nurse's aide. (Id.) A gallbladder ultrasound was scheduled and revealed gallstone disease, and plaintiff underwent laparoscopic gallbladder surgery. (Tr. 218, 256).

-5-

Plaintiff returned to the Wilbers Clinic on May 1, 2006 with complaints of severe dental pain. (Tr. 254). It was noted that plaintiff had very bad teeth and had been scheduled for extractions, but had put off the procedure after discovering that she was pregnant. (Id.) Upon examination, abscessed teeth were noted on the right upper side of plaintiff's mouth. (Id.) Plaintiff was given an antibiotic and pain relievers. (Id.)

On June 14, 2006, plaintiff returned to the Wilbers Clinic with complaints related to a poison ivy rash, and was given cream to use. (Tr. 253). She returned on June 19, 2006 with complaints of new sores on her chest and upper arm and a rash on her left lower leg after unprotected sun exposure, and was given medication and told to use sunscreen. (Tr. 252).

On August 16, 2006, plaintiff returned to the Wilbers Clinic and was given an injection of Rocephin[2] to treat a tooth infection. (Tr. 251). She returned on September 26, 2006 with complaints of a sudden onset of epigastric pain much like what she experienced during a previous gallbladder attack. (Tr. 250). She also reported having an asthma attack and using an inhaler. (Id.) She was diagnosed with gastritis, an ear infection and asthma, and was given an antibiotic, Albuterol,[3] and Zantac.[4] (Id.)

---

[2]Rocephin, or Ceftriaxone, is used to treat various bacterial infections. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a685032.html

[3]Albuterol is a bronchodilator used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung

On November 13, 2006, plaintiff returned to the Wilbers Clinic with complaints of chest heaviness and coughing, and stated that she felt like she had pneumonia. (Tr. 249). Her diagnoses were noted as history of asthma, pregnancy at 24 weeks gestation, acute sinusitis, cough, depression "which seems to be okay," and smoking. (Id.)

On April 2, 2007, plaintiff returned to the Wilbers Clinic. (Tr. 248). It was noted that she was one month post partum, and that she planned to undergo tubal ligation. (Id.) She complained of left knee pain. (Id.) Plaintiff reported having a new man in her life, and Dr. Wilbers wrote that plaintiff was "probably the happiest I have ever seen her. She is doing well every other way." (Id.) Dr. Wilbers noted that plaintiff's knee was painful, with some slight swelling. (Tr. 248). Plaintiff's teeth still required "a lot of work," but her gums were no longer inflamed and plaintiff was trying to keep her teeth clean. (Id.) Dr. Wilbers wrote that plaintiff's "depression is cleared." (Id.)

Plaintiff returned to the Wilbers Clinic on May 18, 2007 with complaints unrelated to the instant applications. (Tr. 247).

_____

diseases such as asthma and chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways). http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a607004.html

[4]Zantac, or Ranitidine, is used to treat ulcers; gastroesophageal reflux disease (GERD), and conditions where the stomach produces too much acid. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601106.html

She returned on June 25, 2007 for an immunization, and complained of a headache and insomnia, and stated that she had been taking Wellbutrin[5] but it made her "very, very moody." (Tr. 246). Dr. Wilbers noted that he discussed manic depression with her, and that plaintiff was "open to going to the Arthur Center, until she can get there, we are going to treat." (Id.) He advised plaintiff to return in two weeks "to check on how her sleep is," and again in October for another immunization. (Id.)

Plaintiff returned to the Wilbers Clinic on July 9, 2007 stating that Seroquel[6] made her sleep through her baby crying, and stated that she wanted to rely more on Prozac.[7] (Tr. 245). She reported some crying spells. (Id.) Dr. Wilbers noted that plaintiff's affect was good, with good eye contact and insight. (Id.) He increased her Prozac dosage and decreased her Seroquel dosage. (Id.)

Plaintiff returned to the Wilbers Clinic on August 13, 2007 with complaints of a headache around her sinuses and a painful

_____

[5]Wellbutrin, or Buproprion, is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/ a695033.html

[6]Seroquel, or Quetiapine, is used to treat the symptoms of schizophrenia, and episodes of mania or depression in patients with bipolar disorder. http://www.nlm.nih.gov/medlineplus/ druginfo/medmaster/a698019.html

[7]Prozac, or Fluoxetine, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/ a689006.html

jaw. (Tr. 244). She reported having had an altercation with a woman who clawed her, and also reported stress from other issues. (Id.) Dr. Wilbers noted that plaintiff had very bad teeth and was trying to save money to have them extracted. (Id.) Dr. Wilbers noted that plaintiff's gums looked very red and infected, and that she had a lot of plaque, decay, and black teeth. (Id.) He diagnosed plaintiff with acute sinusitis, chronic tooth infection, and gingivitis. (Tr. 244). He increased plaintiff's Prozac dosage and also prescribed a decongestant and an antibiotic. (Id.)

Medical records from Pascha Boyd, "RN,P/MHCNS," of the Arthur Center indicate that plaintiff presented on September 18, 2007 requesting evaluation for bipolar disorder. (Tr. 210). Plaintiff reported experiencing depressive symptoms and decreased enjoyment. (Id.) She reported that she had guilt issues relating to parenting at times, feeling that she did not manage her money as well as she should for her children, and feelings of guilt when doing anything for herself. (Id.) Plaintiff complained of low energy levels, fluctuating appetite, poor attention span, a feeling that she "wants to isolate," poor sleep, hyperactivity, and irritability. (Id.) She denied suicidal or homicidal ideation and psychosis. (Tr. 210). Plaintiff reported that, as a single mother, she rarely had a break, and reported "some social anxiety elements; stating that she can feel judged or feels like people won't like her. She avoids a lot of situations where there are lots of people. She has more difficulty, she states, with

females." (Id.) She denied panic attacks, obsessive compulsive elements, and post-traumatic stress history. (Id.) Plaintiff reported that her symptoms had started during her teenage years, but had intensified in the past three years. (Tr. 211). She reported no psychiatric hospitalizations or suicide attempts. (Id.) Plaintiff reported that Prozac, Effexor, Lexapro, Zoloft and Cymbalta had either caused side effects or stopped working. (Id.) Plaintiff reported that she had used alcohol, but stopped after becoming pregnant. (Id.) She reported experimenting with methamphetamine and marijuana, but denied ongoing use. (Tr. 211). Plaintiff reported that she had severe tooth decay, which caused frequent infections. (Id.) Plaintiff reported that she had "no other chronic conditions besides mild asthma, which she [stated was] generally allergy-induced." (Id.) Plaintiff denied any medical concerns. (Id.)

Plaintiff reported that, during school, "she fought a lot with her teachers and principals and didn't have an easy time there," and was often truant. (Tr. 211). Plaintiff denied that she had learning disabilities. (Id.) She stated that she left school at the age of 15½ and had not obtained a GED. (Tr. 211-12). Plaintiff stated that "her employment is generally has not [sic] been an issue; that she loves working, but she's currently unemployed." (Tr. 212). She denied experiencing "problems on the job, being fired or with anger or irritability. She [stated] that it's largely been at home and with her close-knit relationships."

(Tr. 212).  Plaintiff reported that she had three children, aged
six years, 22 months, and 6 months.  (<u>Id.</u>)  She reported that the
father of the two oldest children was an alcoholic and was abusive
to her.  (<u>Id.</u>)  Plaintiff reported that her present relationship
was a positive and healthy one, but that she feared abandonment.
(<u>Id.</u>)

Nurse Boyd opined that plaintiff had many mixed symptoms
suggestive of many different psychological disorders and did not
fit into a diagnostic category.  (Tr. 212).  Nurse Boyd wrote that
this made it difficult to clinically decide where plaintiff fell.
(Tr. 212).  Nurse Boyd opined that plaintiff seemed to have average
intellectual functioning, and had fair insight and judgment, and
that her mental status was otherwise unremarkable and within normal
limits.  (<u>Id.</u>)  Nurse Boyd described plaintiff's diagnostic
formulation as follows:  mood disorder not otherwise specified;
rule out bipolar versus major depressive disorder; anxiety disorder
not otherwise specified; rule out generalized anxiety disorder;
rule out attention deficit/hyperactivity disorder; borderline
personality disorder with cluster B (dramatic, emotional, or
erratic) traits present; chronic problems with tooth decay; and
mild asthma.  (<u>Id.</u>)  Nurse Boyd assessed plaintiff's global
assessment of functioning (also "GAF") as 59.[8]  (Tr. 213).  Nurse

_____

[8]The Global Assessment of Functioning ("GAF") score is the
clinician's judgment of the individual's overall level of
functioning.  <u>See</u> Diagnostic and Statistical Manual of Mental
Disorders, DSM-IV, 30-32 (4th ed. 1994).  GAF scores of 31 to 40

Boyd recommended that plaintiff consider individual counseling and also recommended some self-help reading material. (Id.) Nurse Boyd's records reflect that Paxil[9] and Trazodone[10] were prescribed. (Id.) This office note reflects the signature of John R. Hall, M.D., on October 23, 2007. (Id.)

Plaintiff returned to the Wilbers Clinic on October 2, 2007 with complaints of pain in her tail bone after a fall. (Tr. 243). Severe tooth decay was also noted. (Id.) She was diagnosed with temporomandibular joint (also "TMJ") pain, acute sinusitis, tail bone pain, and dental abscess, and medication was prescribed. She was advised to follow up on October 23 for an immunization and also a flu shot. (Id.) Plaintiff returned on October 12, 2007 and October 15, 2007 with complaints of severe tooth pain and

---

represent some impairment in reality testing, or serious impairment in several areas such as work or school, family relations, judgment, thinking, or mood; GAF scores of 41 to 50 represent serious symptoms or impairment in social, occupational or school functioning; scores of 51 to 60 represent moderate symptoms or difficulty in those areas; and scores of 61 to 70 represent mild symptoms with a reasonably good level of functioning. Id. at 32. Although "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' ... GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning." Halverson v. Astrue, 600 F.3d 922, 930-31 (8th Cir. 2010) (internal quotations and citations omitted).

[9]Paxil, or Paroxetine, is used to treat depression, panic disorder, and social anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698032.html

[10] Trazodone is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html

sinusitis. (Tr. 241-42). X-rays performed on October 23, 2007 revealed dental abscess with bone involvement and possible sepsis, and sinusitis. (Tr. 217).

On October 24, 2007, plaintiff returned to the Wilbers Clinic and reported that she had seen a dentist on October 19 who tried to get approval to pull plaintiff's teeth, but could not due to restrictions in plaintiff's health benefits. (Tr. 240). Dr. Wilbers noted that plaintiff was unable to open her mouth, she was hurting and looked septic, and was febrile. (Id.) Dr. Wilbers diagnosed abscessed teeth and possible sepsis. (Id.) He then wrote: "I sent her to St. Joe's West, they are now just releasing her at 6:15, she is on antibiotics. My staff worked for a very long time, we finally have gotten some information that we may be able to get things taken care of on Friday. Her mother is aware of this, and will let her know." (Id.)

Plaintiff returned to Nurse Boyd on November 7, 2007 for "medication follow-up" and reported that she was doing significantly better on her medication and did not want to change it, but was interested in trying to curb the side effects of weight gain and decreased sex drive. (Tr. 208). Upon examination, plaintiff was alert and oriented and cooperative. (Id.) Her mood had some mild depressive features and more significant anxiety features, but mental status examination was otherwise unremarkable. (Id.) Nurse Boyd discontinued Trazodone and increased Paxil,

prescribed BuSpar,[11] and advised plaintiff to follow up in one to two months, or sooner if needed. (<u>Id.</u>)

Plaintiff returned to Nurse Boyd on January 23, 2008 and reported experiencing irritability as a medication side effect. (Tr. 206). Plaintiff also reported anxiety, trouble sleeping and concentrating, and feeling like she was "all over the place." (<u>Id.</u>) Nurse Boyd wrote that plaintiff "seems to describe a number of personality type features in mood elements and not clearly stating bipolar but there is some medication that there could be problems with that and this may be further reason why she has failed so many antidepressant medication trials. I do feel that even if this is a personality feature versus bipolar which I am not completely convinced of yet but due to the fact that she would be benefit [sic] from something like Risperdal."[12] (<u>Id.</u>) Nurse Boyd noted that plaintiff had a visibly swollen abscessed tooth and had sought Emergency Room care, but that Medicaid would not pay for treatment. (<u>Id.</u>) Plaintiff stated that the pain affected her in a negative way and that she was embarrassed about her appearance. (Tr. 206). Nurse Boyd wrote that plaintiff's dental condition was

---

[11]BuSpar, or Buspirone, is used to treat anxiety disorders, or in the short-term treatment of symptoms of anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a688005.html

[12]Risperdal, or Risperidone, is used to treat various psychological conditions and symptoms, including schizophrenia, bipolar disorder, mania, aggression, and sudden mood changes. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html

"very extreme" and that she would provide support and "sign off on

to say how this is impacting not only her physical health but her

mental emotional well being." (Id.) Nurse Boyd prescribed

Remeron[13] and Risperdal, and instructed plaintiff to return in one

to two months, or sooner if needed. (Id.)

Plaintiff returned to Nurse Boyd on March 5, 2008 for

medication follow up. (Tr. 204). She reported that there had been

many deaths in her family, and that she felt overwhelmed. (Id.)

She stated she could not stick with her medication because Remeron

made her too sedated and Risperdal gave her headaches. (Id.) She

stated that Prozac had helped her in the past and she wanted to

begin taking it again, explaining that the side effect of

irritability only occurred when she missed a dose. (Id.) Upon

examination, plaintiff was alert, oriented and cooperative, but had

a depressed, anxious, irritable mood. (Tr. 204). Mental status

examination was otherwise unremarkable. (Id.) A trial of Prozac

and Vistaril[14] were given. (Id.)

On April 7, 2008, plaintiff returned to the Wilbers

Clinic for an immunization, which she had been putting off due to

_____

[13]Remeron, or Mirtazapine, is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster
/a697009.html

[14]Vistaril, or Hydroxyzine, is used to relieve the itching
caused by allergies and to control the nausea and vomiting caused
by various conditions, including motion sickness. It is also used
for anxiety, and to treat the symptoms of alcohol withdrawal.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html

her frequent oral infections. (Tr. 239). She reported that she "was finally able to get something done about her teeth" and was working with an oral surgeon. (Id.) Dr. Wilbers noted that plaintiff was "very tight" in her lungs. (Id.) He noted that plaintiff smoked over one pack of cigarettes per day, which represented a decrease from her prior reported consumption of one and one-half packs per day. (Id.) She was not using inhalers. (Tr. 239). Dr. Wilbers prescribed Combivent[15] and ordered testing. (Id.) Chest X-ray performed on April 9, 2008 was normal. (Tr. 216).

Plaintiff returned to the Wilbers Clinic on May 5, 2008 for a pulmonary function test which Dr. Wilbers interpreted as "very good." (Tr. 238). Plaintiff reported that she was having her teeth fixed, and was also having ovary removal surgery due to a hemorrhagic cyst. (Id.)

Plaintiff returned to the Wilbers Clinic on May 21, 2008 and was very emotional and crying, and Dr. Wilbers noted that plaintiff had developed another tooth abscess and also that she had experienced a complication during her ovary removal surgery. (Tr. 237). Dr. Wilbers noted that plaintiff's gum line was abscessed

---

[15]Combivent is a combination of ipratropium and albuterol, and is used to prevent wheezing, breathing difficulties, chest tightness, and coughing in people with chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways) such as chronic bronchitis (swelling of the air passages that lead to the lungs) and emphysema (damage to the air sacs in the lungs). http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601063.html

and very swollen, and that plaintiff was in a lot of pain. (Id.)
He noted that plaintiff had been able to afford to have only four
teeth pulled, and that plaintiff was unemployed and financially
stressed. (Id.) He diagnosed abscess with excessive pain, and
excessive stress. (Id.)

Plaintiff returned to the Wilbers Clinic on June 4, 2008
with complaints of pain deep in her throat. (Tr. 236). Nurse
Swoboda noted dental decay, clear lungs with no wheezing, and
diagnosed a recurring abscess and tonsil pain. (Id.)

Plaintiff returned to the Wilbers Clinic on July 8, 2008
with complaints of a low grade temperature and tooth pain. (Tr.
235). She reported having undergone a partial hysterectomy. (Id.)
She reported having found a dentist who took payments in $10.00
increments, and who would remove three teeth at once and help her
get dentures. (Id.) Plaintiff also reported left ankle pain and
swelling after a fall. (Id.) She explained that she had been
carrying her two-year-old on a wet boat deck when she slipped,
causing her foot to go behind her. (Tr. 235). Dr. Wilbers noted
that plaintiff had endured numerous dental problems, had
experienced complications during ovary removal surgery, and had
also undergone a hysterectomy, and concluded that plaintiff "has
had a very rough time." (Id.) He noted three abrasions on
plaintiff's left ankle, and also noted that the ankle was swollen
and discolored. (Tr. 235). Ankle x-ray performed on this date
revealed no fracture or dislocation. (Tr. 214). Dr. Wilbers

-17-

diagnosed left ankle sprain and dental cavities with abscess, and prescribed an antibiotic and an analgesic. (Id.)

Records from Wellsville Medical Clinic (also "Wellsville Clinic") indicate that plaintiff was seen on July 30, 2008 with complaints of anxiety, insomnia, and depression for the past three months. (Tr. 277). She reported that Buspar made her irritable, and that Seroquel and Trazodone had not worked, and she was not sleeping. (Id.) She had no musculoskeletal complaints. (Id.) She was given Alprazolam,[16] among other medications. See (Id.) She was instructed to follow up in four weeks. (Id.)

On August 6, 2008, plaintiff returned to the Wilbers Clinic with complaints of swelling in her right gland. (Tr. 234). She reported that she was to have her teeth pulled at the end of the month. (Id.) She reported being "extremely stressed out, because of being a single parent, and her support is working out of state," and also reported that her parents were divorcing. (Id.) She reported taking Amitriptyline,[17] Celexa[18] and Alprazolam, which she felt were not working. (Id.) She reported that she stopped trying to get an appointment at the Arthur Center after they

_____

[16]Alprazolam, also known as Xanax, is used to treat anxiety disorders and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684001.html

[17]Amitriptyline, also known as Elavil, is used to treat symptoms of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html

[18]Celexa, or Citalopram, is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html

cancelled her twice. (Tr. 234). She reported several gynecological issues, and stated that she had not been ready to stop having children. (Id.) Dr. Wilbers noted that plaintiff completed a questionnaire and that "everything was positive for the most part on it." (Id.) He noted that plaintiff had dental cavities and tenderness and enlargement over her lymph node. (Id.) He diagnosed dental cavities and mood disorder, and gave her analgesics and Symbyax.[19]

On August 19, 2008, plaintiff returned to the Wellsville Clinic and reported that she could tell that the medications had helped some but not enough for her to say things were good. (Tr. 276). She had no musculoskeletal complaints. (Id.) Alprazolam dosage was increased. (Id.)

On August 20, 2008, plaintiff was seen at St. Joseph Health Center in Wentzville with complaints of increased anxiety problems. (Tr. 264-73). She was given Klonopin[20] and advised to follow up with a mental health provider. (Id.)

Plaintiff returned to the Wellsville Clinic on September 2, 2008, stating that she was not doing well and was extremely nervous. (Tr. 275). She reported poor sleep. (Id.) She returned

---

[19]Symbyax is a combination of drugs used to treat schizophrenia and bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601213.html

[20]Klonopin, or Clonazepam, is used to control seizures and/or anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html

again on September 5, 2008 with complaints of low back pain with no
radiation down her legs. (Tr. 274). She was given Toradol.[21]
(Id.)

On December 12, 2008, Mark Altomari, PhD, completed a
Psychiatric Review Technique form. (Tr. 279-90). He opined that
plaintiff had a mood disorder and an anxiety disorder, but that
neither fit the diagnostic criteria of the Affective Disorders or
the Anxiety-Related Disorders categories. (Tr. 279, 282-83). He
opined that plaintiff had a moderate degree of limitation in
maintaining social functioning and concentration, persistence or
pace; a mild degree of limitation in activities of daily living;
and no repeated episodes of decompensation of extended duration.
(Tr. 287). Dr. Altomari found plaintiff to be moderately limited
in her ability to understand, remember and carry out detailed
instructions and maintain concentration for extended periods; to
work in coordination with or proximity to others without being
distracted by them; to accept instructions and respond
appropriately to criticism from supervisors; and to get along with
coworkers or peers without distracting them or exhibiting
behavioral extremes. (Tr. 291-92). He determined that plaintiff
was "not significantly limited" in all other areas. (Id.)

Dr. Altomari noted plaintiff's diagnoses of mood disorder

---

[21]Toradol, or Ketorolac, is used on a temporary basis to
relieve moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a693001.htm
l

not otherwise specified and anxiety disorder not otherwise specified, and noted that plaintiff had been tried on multiple medications but had stopped taking them due to perceived side effects. (Tr. 289). He noted that plaintiff frequently reported being stressed due to personal/situational issues, and described being anxious, depressed and irritable. (Id.) Dr. Altomari noted that mental status examinations were largely intact. (Id.) Dr. Altomari noted that plaintiff was a single mother of three young children and that she provided all of their care. (Id.) He noted that plaintiff prepared meals, performed household chores, went out every day, drove, was able to be out alone, shopped weekly, handled her own finances, watched television and read with her children, and socialized with her mother and boyfriend several times per week. (Tr. 289). Dr. Altomari noted that plaintiff did not like being around a lot of people and tended to become more anxious. (Id.) He noted that plaintiff reported having difficulty following detailed instructions, and that she did not always finish what she started. (Id.)

Dr. Altomari opined that plaintiff presented as quite functional despite her reported symptoms, and that her medical records indicated that she reported having had no problems maintaining employment and quit only when she became pregnant. (Id.) Dr. Altomari found plaintiff's allegations generally credible. (Tr. 289).

Records from Wellsville Clinic indicate that plaintiff

-21-

saw Eric Kondro, M.D., on several occasions from January 19, 2008 through December 10, 2009 with complaints of back pain, anxiety, dental pain, stress, headaches, and depression. (Tr. 294-330). Lumbar spine x-ray performed on November 7, 2008 revealed straightening of the lumbar lordosis. (Tr. 330). Lumbar spine MRI performed on December 12, 2008 revealed disk degenerative changes at the L4-5 level with disk space narrowing, diffuse disk bulging and a small midline disk protrustion. (Tr. 329). Bilateral mild foraminal narrowing was seen at the L5-S1 level although there was no significant disk disease at this level. (Id.) Dr. Kondro referred plaintiff to Joseph Meyer, M.D.

On January 20, 2009, plaintiff presented to Dr. Meyer with complaints of low back pain that had worsened over the past few months. (Tr. 382). Plaintiff described the pain as constant, sharp, aching and dull, with some bilateral numbness and tingling in her heels. (Id.) She denied psychological counseling. (Id.) She was noted to have chronic obstructive pulmonary disease (also "COPD") and asthma. (Id.) She reported smoking one pack of cigarettes per day. (Tr. 383). Upon examination, plaintiff stood erect and was able to perform heel walk and tiptoe maneuvers without difficulty. (Tr. 384). Lumbar flexion was performed to 40 degrees, but plaintiff refused to perform lumbar extension. (Id.) Straight leg raise testing was positive at only 15 degrees. (Id.) Abduction and external rotation of her hip joints, and palpation of her lower back, did not cause pain. (Id.) She had intact motor

strength and moved all four extremities freely. (Tr. 384).

Dr. Meyer interpreted plaintiff's December 12, 2008 lumbar spine MRI as revealing evidence of L4-5 disk dehydration and some modest L4-5 broad based disk bulging causing some central thecal sac encroachment. (Tr. 384). There was no significant evidence of foraminal stenosis, and other levels were unremarkable. (Id.) Vertebral body height was well maintained, and normal lumbar curvature was noted. (Id.)

Dr. Meyer assessed lumbar intervertebral disk disease, and wrote that he had "explained to [plaintiff] that her disk disease is relatively mild" and that she could undergo epidural steroid injection, but that "her long term prognosis [is] going to depend on her own efforts to maintain proper core strength and posture." (Tr. 384). Dr. Meyer arranged for plaintiff to begin physical therapy for strength and flexibility training, and performed lumbar epidural steroid injection. (Tr. 384-85).

On March 17, 2009, plaintiff returned to Dr. Meyer, who noted that plaintiff could not undergo physical therapy because Medicaid would not cover it. (Tr. 365). Plaintiff reported that the steroid injection had reduced her back pain by 50%. (Tr. 364). She reported continued achy/sharp pain in her lumbar region, but denied lower extremity symptoms. (Id.) Dr. Meyer noted that plaintiff appeared much more comfortable, with a normal stance and gait. (Id.) Straight leg raise testing was negative bilaterally, and plaintiff moved her lumbar spine freely. (Id.) Dr. Meyer

recommended that plaintiff pursue exercises that encourage proper posture and weight loss, and to avoid heavy lifting. (Id.) Dr. Meyer recommended that plaintiff engage in walking, bicycling, and swimming. (Id.) Plaintiff requested "something to help me sleep at night because the pain is so bad at night," but Dr. Meyer wrote that he did not think it was medically indicated for plaintiff to be using medications for those purposes, especially when her pain had significantly improved. (Id.) Dr. Meyer wrote that he advised plaintiff that "use of medications for mild pain syndrome such as her's [sic] simply leads to worsening of the pain syndrome in the long term because it tends to promote improper attention on medications and discourages proper pursuit of healthy living habits, diet, and exercise." (Tr. 365). Dr. Meyer performed another steroid injection, but stressed that plaintiff should not undergo more than two such injections per year. (Id.)

On April 1, 2009, plaintiff saw Dr. Rolando Larice with complaints of depression, anger and violence. (Tr. 402). She reported that she was not taking any psychiatric medications. (Id.) She reported that she "once had thoughts" related to suicide. (Tr. 403). Mental status examination revealed several symptoms, but it is unclear from Dr. Larice's notes what his impression and/or plan was for plaintiff. (Id.)

Records from Associated Medical Arts indicate that plaintiff was seen on February 5, 2010, and noted that she was doing well on Symbyax and was sleeping well. (Tr. 332). She was

still smoking, and was advised to quit. (Id.) She returned on March 4, 2010 and reported she was taking Symbyax and doing much better. (Tr. 333).

On February 14, 2010, plaintiff presented to the Audrain Medical Center emergency room with complaints of a laceration on her left eyebrow after being punched while trying to break up a bar fight. (Tr. 334-46, 351). Medical treatment providers noted that plaintiff had alcohol on her breath. (Tr. 334-46).

C.  Other Evidence

In a Function Report dated September 6, 2008, plaintiff described her daily activities. Plaintiff wrote that she got up, put her older daughter on the bus, fed her two younger children and watched a couple of movies with them, fed them lunch, did dishes and housework during the two hours they napped, woke them from their naps, prepared a snack when her older daughter returned home, watched television, started getting things together for dinner, prepared dinner around 6:00 p.m., sat down and ate dinner, then bathed the children and put them to bed, and showered and went to bed around 9:00 p.m. (Tr. 155, 157, 162). Plaintiff wrote that she did "everything" for her three children. (Tr. 156). She wrote that she was no longer able to interact with others, take her children places, or talk to people. (Id.) She wrote that she went outside to check the mail or if she needed to go somewhere, and wrote that she drove a car and could go out alone. (Tr. 158). She wrote that she shopped for groceries once per month for 45 minutes,

and shopped for household needs "weekly." (Id.) Plaintiff wrote that she watched television with the children and read books to them every day. (Tr. 159). She wrote that she talked to her mother on the telephone two to three times per day, and that her boyfriend visited her at her home every day. (Id.) Plaintiff wrote that she went to her mother's house two times per week. (Id.) She wrote that she had anxiety attacks when she was in a group of people, and also complained of breathlessness while walking or climbing stairs. (Tr. 160). She wrote that she could follow short instructions but that she was not sure about long instructions, and needed to have spoken instructions repeated a couple of times. (Id.) She wrote that she got along with authority figures unless they yelled at her or got upset with her. (Tr. 161). She wrote that it was hard for her to finish what she started. (Tr. 162).

On that same date, Raymond Aery, who identified himself as plaintiff's partner, completed a Function Report. Mr. Aery wrote that he had known plaintiff for two years and spent 5 to 6 hours per day with her. (Tr. 166). He wrote that plaintiff was restless and had trouble coping through a day. (Tr. 169). He wrote that plaintiff shopped in department and grocery stores, and shopped weekly for every day needs. (Id.) He wrote that plaintiff needed to have appointments written on a calendar in order to remember them. (Tr. 170). He wrote that plaintiff was easily angered or frightened, and did not like to go places with a lot of

people.  (Tr. 170-71).  He wrote that plaintiff had trouble completing projects, and needed to have instructions repeated. (Tr. 171).

### III.   The ALJ's Decision

With respect to plaintiff's application for DIB, the ALJ noted that plaintiff's last date insured was June 30, 2008. (Tr. 8, 10).  The ALJ determined that plaintiff had not engaged in substantial gainful activity since February 1, 2006, her alleged onset date.  (Tr. 10).  The ALJ determined that plaintiff had the severe impairments of degenerative disc disease, depression, and anxiety disorder.  (Id.)  The ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (Tr. 11).

The ALJ determined that plaintiff had the residual functional capacity (also "RFC") to perform light work as defined in the regulations, "except {plaintiff] require[d] work in relative isolation."  (Tr. 12).  The ALJ determined that plaintiff was able to interact appropriately with co-workers and supervisors in an unskilled context, remember and understand short and simple instructions, carry out simple routine tasks, and sustain the concentration necessary for unskilled work.  (Id.)  At step four of the sequential evaluation process, the ALJ determined that plaintiff could perform her past work as a fast food worker, general production laborer, and convenience store cashier, and that

this work did not require the performance of work-related activities precluded by plaintiff's RFC. (Tr. 16). The ALJ noted that each of those positions was considered unskilled with the SVP level of two, and required the light exertional level of work. (<u>Id.</u>)

The ALJ continued the sequential evaluation process and considered plaintiff's age, education, work experience and RFC in conjunction with the Medical Vocational Guidelines (also "Guidelines"). (Tr. 17-18). The ALJ wrote that plaintiff's additional limitations had little to no effect upon the occupational base of unskilled light work, and concluded that plaintiff was not disabled under the Social Security Act (also "Act") at any time from her alleged onset date through the date of his decision. (Tr. 17-18). In explaining his finding regarding plaintiff's additional limitations, the ALJ wrote that plaintiff's "social limitation of superficial interaction with others has only a slight effect on the occupational base." (Tr. 18).

## IV. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Act, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Act defines disability as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to a listed impairment, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant

-29-

work.  If so, the claimant is not disabled.  If not, the Commissioner continues the sequential evaluation process and considers various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance, but enough that a reasonable person would find adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  To determine whether evidence is substantial, this Court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  This Court is not permitted to reverse "merely because substantial evidence also exists that would support a contrary outcome, or because we would have decided the case differently.  Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir.  2001)); see also Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted) ("if there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have

supported an opposite decision").

In the case at bar, plaintiff claims the ALJ's decision is not supported by substantial evidence on the record as a whole. In support, plaintiff claims that the ALJ's credibility determination was not legally sufficient, and that the ALJ failed to properly analyze the medical evidence of record. Plaintiff also advances several arguments directed at the ALJ's step four and step five findings. In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

A.  Credibility Determination

In determining the credibility of a claimant's subjective complaints, an ALJ must consider all evidence relating to those complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984).  The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working.  Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Juszczyk v. Astrue,

542 F.3d 626, 632 (8th Cir. 2008); see also Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

Plaintiff argues that the ALJ unreasonably evaluated her daily activities as inconsistent with disability. In support, plaintiff cites Rainey v. Dep't of Health & Human Services, 48 F.3d 292 (8th Cir. 1995) and notes that the Eighth Circuit stressed therein that "activities such as doing dishes, light cooking, reading, watching television, and driving to shop for groceries are not substantial evidence of the ability to do full-time competitive work." (Docket No. 16 at 13-14). Plaintiff also cites Eighth Circuit decisions in which it was determined that similar activities were not substantial evidence of the ability to perform full-time work. (Id.)

As defendant acknowledges, the Eighth Circuit has recognized that there are "mixed signals" regarding the significance of a claimant's daily activities in evaluating claims of disabling pain. Clevenger v. Social Sec. Admin., 567 F.3d 971, 976 (8th Cir. 2009). However, it is well-settled that an ALJ may properly consider daily activities as one factor in evaluating the credibility of a claimant's subjective complaints. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). This is what the ALJ did in this case: he properly considered plaintiff's daily

activities as but one factor detracting from her credibility.

In the case at bar, the ALJ acknowledged his duty to consider plaintiff's subjective allegations in accordance with 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p, the regulations and social security rulings corresponding with <u>Polaski</u> and credibility determination. The ALJ then conducted an extensive review of the record and fully explained his reasoning in concluding that plaintiff's subjective allegations were not entirely credible.

The ALJ in this case determined that plaintiff's daily activities were restricted only to a mild degree, and that the record demonstrated that plaintiff was able to care for her three small children and also to attend to her own personal care. The ALJ also noted that plaintiff was able to prepare daily meals, perform light housework, and do laundry. The ALJ also noted that plaintiff regularly drove a car and went shopping. These findings are entirely consistent with her Function Report, summarized above, in which she described the numerous daily tasks she performed to care for herself, her children, and her home. Plaintiff did not merely engage "in some household tasks" as she contends in her brief. (Docket No. 16 at page 15). Activities such as those considered in the case at bar have been observed to be inconsistent with allegations of total disability. <u>Pirtle v. Astrue</u>, 479 F.3d 931, 933 (8th Cir. 2007) (affirming the ALJ's finding that daily activities including regularly driving, shopping, performing

housework such as cooking, cleaning and washing dishes, caring for personal needs, and caring for children were inconsistent with allegations of total disability).

Plaintiff also contends that the ALJ improperly considered the fact that she smokes cigarettes. Indeed, despite the fact that plaintiff reported breathing problems and was noted to have a history of asthma, her medical treatment providers repeatedly noted that she smoked one to one and one-half packs of cigarettes per day. An ALJ may properly consider a claimant's failure to quit smoking as a factor detracting from her credibility. Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997). Also, plaintiff's continued smoking was but one of the many factors that support the ALJ's adverse credibility determination.

Despite plaintiff's arguments to the contrary, the ALJ properly considered plaintiff's daily activities and her continued smoking as but some of the factors relevant to the credibility of her subjective allegations. The ALJ extensively discussed his decision-making process in this regard, and gave several valid reasons for finding plaintiff less than fully credible. See Finch v. Astrue, 547 F.3d 933, 935-36 (8th Cir. 2008) (stating the standard for deferring to an ALJ's credibility determination).

The ALJ noted that plaintiff gave conflicting statements about how her psychological condition affected her. The ALJ noted that plaintiff testified that some days, a few days per week, she was so depressed that she stayed in bed, testimony which was

inconsistent with her other testimony that, on a daily basis, she had highs all the time and would go from happy to sad to mad. The ALJ noted that this bore upon plaintiff's credibility. It was proper for the ALJ to consider the fact that plaintiff gave inconsistent hearing testimony. See Boettcher v. Astrue, 652 F.3d 860, 864 (8th Cir. 2011); see also Fitzsimmon v. Mathews, 647 F.2d 862, 863-64 (8th Cir. 1981) (in assessing a claimant's credibility, an ALJ may properly consider a claimant's lack of sincerity).

The record also indicates that plaintiff told Nurse Boyd in September of 2007 that she loved working and never had any problems on the job, and that her mental health symptoms affected her largely at home and with her close knit relationships. While there is some evidence in the record that plaintiff reported exacerbations in psychological symptoms due to situational stressors, the record does not contain any evidence indicating that her psychological condition actually deteriorated since she stopped working. A condition which was present during working years and has not worsened cannot be used to prove present disability. Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994) (internal citation omitted). This is consistent with evidence in the record indicating that plaintiff reported that she left her last job as a nurse's aide not due to any of the conditions she now alleges are disabling, but due to her pregnancy. Leaving work for reasons unrelated to an alleged disabling impairment weighs against a finding of disability. Medhaug v. Astrue, 578 F.3d 805, 816-17 (8th Cir. 2009); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir.

1992).

Of some note is the fact that, despite plaintiff's testimony that she suffered from disabling psychiatric symptoms and evidence in the medical records that she reported that Prozac helped her, plaintiff told Dr. Larice in April of 2009 that she was not taking any psychiatric medications. While certainly not dispositive, this evidence tends to support the ALJ's adverse credibility determination. The lack of prescription medication is inconsistent with allegations of disabling impairments. <u>Rankin v. Apfel</u>, 195 F.3d 427, 430 (8th Cir. 1999).

Also notable is the fact that plaintiff testified that she suffered from back pain of such severity that she was essentially bedridden for three to four days at a time. This testimony is not consistent with the medical records documenting plaintiff's treatment for back pain. When plaintiff saw Dr. Meyer, she did not describe symptoms or limitation of such severity. Similarly, plaintiff testified that she suffered from carpal tunnel syndrome and woke in the night with pain, and that she could not lift a gallon of milk or write without pain. However, plaintiff made no mention of such symptoms when seeking medical care. It is proper for an ALJ to consider the fact that plaintiff did not complain of symptoms she alleges are disabling when seeking medical treatment. <u>Stephens v. Shalala</u>, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later allegations of pain when no such complaints were made while receiving other treatment).

The ALJ noted that plaintiff's limitations appeared to be

a result of her own choice instead of due to disability.  This is consistent with the record.  As the ALJ noted, the record demonstrates that plaintiff engaged in numerous behaviors requiring social interaction, such as maintaining meaningful relationships with her three children, her mother, and her boyfriend; keeping medical appointments; shopping; regularly visiting with others via telephone and in person; and socializing in a bar.  The record indicates that plaintiff told Dr. Wilbers in April of 2007 that she was very happy to have a new man in her life, and she told Nurse Boyd in September of 2007 that she was in a positive and healthy relationship.  The record also contains evidence from Mr. Aery, who wrote that he had been in a relationship with plaintiff for two years and spent five to six hours per day with her.  Regarding plaintiff's allegations of a disabling back condition, plaintiff's limitations also appeared to be the result of her own choice, inasmuch as Dr. Meyer described her back condition as mild and encouraged her to engage in a wide range of physical activity, including bicycling, swimming and walking.  Evidence that a claimant's limitations are self-imposed rather than due to medical necessity is a basis upon which an ALJ may discredit a claimant's alleged limitation.  <u>See</u> <u>Brunston v. Shalala</u>, 945 F.Supp. 198, 202 (W.D. Mo. 1996) ("Plaintiff also testified that she spent part of the day lying down; however, no physician stated that such a need existed"); <u>Schroeder v. Sullivan</u>, 796 F.Supp. 1265, 1270 (W.D. Mo. 1992) (holding that the claimant's need to take naps was not documented in the record and the claimant's failure to complain to

his doctors about drowsiness conflicted with his testimony that he required naps during the day).

The ALJ found that plaintiff did not appear to be experiencing progressive physical deterioration which might be expected when there is pain of the intensity and frequency plaintiff alleged. See Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). The ALJ also noted that the extent of plaintiff's described symptoms was not reflected to the same severe degree in the medical records. Indeed, when seeking medical treatment, plaintiff did not report complaints of the same or similar intensity as those she described during her hearing testimony. It was proper for the ALJ to consider plaintiff's statements which were inconsistent with the record as detracting from her credibility. See Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001).

Having considered the ALJ's adverse credibility determination with the requisite deference, the undersigned concludes that it is supported by substantial evidence on the record as a whole. The ALJ thoroughly explained his decision-making process in discrediting plaintiff's subjective allegations of disabling symptoms, and gave good reasons for finding plaintiff less than fully credible. See Juszczyk, 542 F.3d at 632 ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination").

B.    Medical Opinion Evidence

Plaintiff also claims that it is unclear what medical opinion the ALJ relied upon in determining RFC; that the ALJ placed undue weight upon the opinion of the State Agency psychologist; and that the ALJ "formed his own opinion of the medical evidence instead of relying upon the interpretation of a treating source." (Docket No. 16 at page 12).    Review of the decision reveals no error.

After exhaustively discussing all of the medical evidence of record, the ALJ in this case discussed the December 12, 2008 opinion of Dr. Altomari, the State Agency psychologist.    After detailing Dr. Altomari's findings, the ALJ wrote that he was giving them "substantial weight" as they were "consistent with the treating medical records, objective medical evidence, and overall record."    (Tr. 16).    The ALJ wrote that Dr. Altomari's findings were "incorporated into the determination of the claimant's residual functional capacity." (Id.) Despite plaintiff's argument to the contrary, it is not "unclear" what medical opinion the ALJ relied upon, nor can it be said that the ALJ "formed his own opinion" of the medical evidence of record.    Plaintiff does not argue, nor does examination of the record reveal, that Dr. Altomari's findings are inconsistent with those of any of plaintiff's treating sources or any other evidence in this administrative record.    In fact, Dr. Altomari's findings are consistent with the treatment records of the Arthur Center, where it was noted that plaintiff displayed numerous symptoms and that

her psychological conditions did not fit into any particular diagnostic category. The ALJ in this case properly decided to give substantial weight to Dr. Altomari's opinion after finding that it was consistent with the other medical evidence of record, fully explaining his rationale for doing so as required by 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

C.    The ALJ's Step Four and Step Five Determinations

Plaintiff next advances several arguments challenging the ALJ's step four conclusion that she could return to her past relevant work, and the ALJ's conclusion at step five. Most notably, plaintiff argues that the ALJ failed to make a detailed comparison between the requirements of her past work and her RFC; failed to analyze her ability to perform the mental demands of her past work and those of other relevant work; and failed to elicit evidence regarding whether plaintiff could perform work despite her restriction to working in relative isolation. In response, the Commissioner contends that the ALJ used VE testimony at step four to delineate the demands of plaintiff's past work; that the Court should look to the entirety of the ALJ's analysis rather than just to his summary or conclusion; and that plaintiff provided written documentation of her past relevant work. (Docket No. 19 at 11-14).

The undersigned cannot say that the ALJ in this case properly accounted for his own determination that plaintiff required work in relative isolation. An ALJ is required to "fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare

-40-

that with what the claimant herself is capable of doing before he determines that she is able to perform past relevant work." <u>Nimick v. Secretary of Health and Human Services</u>, 887 F.2d 864, 866 (8th Cir. 1989). For a claim involving a mental or emotional impairment, the ALJ should investigate the demands of the past jobs in order to determine if the claimant's mental impairment is compatible with the job. <u>Groeper</u>, 932 F.2d at 1238. In so investigating, the ALJ may rely on the claimant's description of her actual job, or may look to how the job is performed in the national economy. <u>Stephens v. Shalala</u>, 50 F.3d 538, 542 (8th Cir. 1995). The ALJ can satisfy his duty to make the requisite findings by referring to the DOT's job description of the claimant's past work, <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 569 (8th Cir. 1991), or reliance upon vocational expert testimony. <u>Wagner</u>, 499 F.3d at 854.

In the case at bar, the ALJ determined that plaintiff's depression and anxiety were severe impairments. Despite his legally sufficient credibility determination, the ALJ specifically determined that plaintiff's ability to perform the full range of light work was limited inasmuch as she required work in relative isolation. During the administrative hearing, the ALJ heard testimony from a VE identified only as Ms. Hurley. The only question the ALJ asked the VE was: "Ms. Hurley, would you share with us?" (Tr. 23). In response, the VE briefly classified plaintiff's past relevant work in terms of skill level, exertional level, and SVP level. (<u>Id.</u>) The VE did not offer, nor did the ALJ

elicit from her, testimony regarding the mental demands of plaintiff's past work, and it therefore fails to provide any support for the ALJ's determination that plaintiff remained able to perform her past relevant work.

While the ALJ dutifully analyzed all of the medical and other information of record, he made no specific findings as to the mental demands of plaintiff's past relevant work. The VE's testimony included nothing regarding the mental requirements of plaintiff's past relevant work, or whether any of plaintiff's past jobs could be performed by a person who was required to work in relative isolation. It therefore cannot be said that the VE's testimony amounts to substantial evidence to support the conclusion that plaintiff remains able to perform the mental demands of her past relevant work.

Nor did the ALJ refer to the Dictionary of Occupational Titles. While it may be arguable that the ALJ implicitly referenced the DOT when he referred to unskilled work with an SVP of two, the lack of an express reference reflects more than a mere deficiency in opinion-writing technique. Cf. McGinnis v. Chater, 74 F.3d 873, 875 (8th Cir. 1996) (asserted errors in opinion-writing do not require reversal if the error does not affect the outcome). The ALJ in this case posed no hypothetical question of the VE or in any way sought to clarify the mental demands of plaintiff's past work. This supports the conclusion that the ALJ appears to have ignored his duty to make specific findings regarding plaintiff's past work. See Pfitzner, 169 F.3d at 569.

Similarly, while the administrative record does include plaintiff's own descriptions of her past work, as the Commissioner contends, those descriptions contain no information regarding the mental demands of her past work. <u>See</u> (Tr. 175-82).

Because the ALJ failed to make the required specific findings regarding the mental demands of plaintiff's past work, the undersigned cannot say that substantial evidence supports the ALJ's step four determination. <u>See</u> <u>Pfitzner</u>, 169 F.3d at 569 (Where the ALJ failed to make specific findings regarding the detailed demands of the claimant's past work, his step four conclusion was not supported by substantial evidence).

As the Commissioner notes, the ALJ continued the sequential evaluation process to step five, using the Medical Vocational Guidelines to determine that plaintiff was not disabled. Plaintiff challenges this determination as well. In response, the Commissioner contends that because the ALJ determined at step four that plaintiff could return to her past relevant work, plaintiff's step five arguments are moot. Having determined that the ALJ's step four determination was not supported by the record, the undersigned has considered the ALJ's step five determination, and determines that it is not supported by substantial evidence on the record as a whole.

"If a claimant has a nonexertional impairment, the Guidelines and grid are not controlling and cannot be used to direct a conclusion of disabled or not disabled without regard to other evidence, such as vocational testimony." <u>Brock v. Apfel</u>, 674

F.3d 1062, 1064 (8th Cir. 2012) (internal citations omitted).
There is, however, an exception to this rule: an ALJ may use the
guidelines even though there is a non-exertional impairment if the
ALJ finds, and the record supports the finding, that the non-
exertional impairment does not diminish the claimant's residual
functional capacity to perform the full range of activities listed
in the Guidelines.  Id. (citing Thompson v. Bowen,850 F.2d 346 (8th
Cir. 1988)).

     At step five, the ALJ determined that plaintiff's "social
limitation of superficial interaction with others has only a slight
effect on the occupational base."  (Tr. 18).  However, the
undersigned cannot say that "superficial interaction" equates to
the ALJ's determination that plaintiff required work in relative
isolation.  Superficial interaction and work in relative isolation
are not synonymous.  The former describes interacting with others
in a casual or perfunctory manner, while the latter describes
working alone and not interacting with others.  The ALJ made no
attempt to clarify his use of different language to describe the
effect of plaintiff's non-exertional impairment, leaving the
undersigned unsure exactly what the ALJ meant when he referred to
superficial interaction at step five.  Having considered the ALJ's
decision in its entirety with the appropriate deference, the
undersigned cannot say that the ALJ's use of conflicting language
is the result of a deficiency in opinion-writing technique.  Cf.
McGinnis, 74 F.3d at 875 (asserted errors in opinion-writing do not
require reversal if the error does not affect the outcome).

The undersigned therefore cannot confidently say that the ALJ made a finding, which is supported by the record, that plaintiff's non-exertional impairment did not diminish her RFC to perform the full range of activities listed in the guidelines. See Brock, 674 F.3d at 1064. The ALJ's step five conclusion is therefore not supported by substantial evidence on the record as a whole. See Id.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed, and this cause remanded for proceedings consistent with this opinion.

The parties are advised that they have until September 14, 2012, to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of August, 2012.